AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
for the
Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
The Residence at 215 North Commonwealth Avenue,
Apartment C, Los Angeles, CA 90004

)
)
)
)
)
)

Case No. 2:17-MJ-3156

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Central_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1159 | Misrepresentation of Indian Goods and Products |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Zachary J. Oper, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and state: Los Angeles, California

_____
*Judge's signature*

Hon. Rozella Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Katherine A. Rykken, x. 3659

**ATTACHMENT A**

<u>PROPERTY TO BE SEARCHED</u>

The property to be searched is the home of Robert HAACK and Zenia Orbe, located at 215 North Commonwealth Avenue, Apartment C in the basement and first and second floor of the duplex in Los Angeles, California, 90004 (the "RESIDENCE"). The RESIDENCE is one unit of a two-unit, two-story property, white in color, approximately 2,103 square feet, and surrounded by a privacy fence. The RESIDENCE has a gate that has to be manually opened to enter or exit the driveway. The rear of the RESIDENCE is paved and used for parking and storage.

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   All evidence at the location described in Attachment A that relates to violations of 18 U.S.C. § 1159, sale of items falsely represented as made by a particular Native American artisan, including:

a.   Loloma style jewelry bearing any variation of the "Loloma" hallmark;

b.   Lists of customers and related identifying information; types, amounts, and prices of jewelry produced sold and or manufactured; any and all correspondence in relation to jewelry sales, production or business practices; all bank records, checks, credit card bills, account information, books, records, receipts, notes, ledgers, and other records as they may relate to the aforementioned violations of the Indian Arts and Crafts Act; the term "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMSs, optical discs, backup tapes, printer buffers, smart cards, flash/thumb drives, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting):

[Instrumentality Protocol]

any mechanical form (such as printing or typing); and any
photographic form (such as microfilm, microfiche, prints,
slides, negatives, videotapes, motion pictures, and
photocopies);

        c.    tools and instruments involved in the
manufacturing, production and sales of jewelry;

        d.    personal books and records reflecting names,
addresses, telephone numbers, and other contact or
identification data relating to the manufacture and sale of the
prohibited items;

        e.    hallmarking/signature tool(s) with any
combination of letters;

        f.    documents indicating travel in interstate and
foreign commerce such as travel itineraries, plane tickets,
boarding passes, motel and hotel receipts, credit card receipts,
and telephone bills recording travel;

        g.    documents relating to birth, heritage, or
lineage; and

        h.    documents indicating property ownership and
tenancy.

[Instrumentality Protocol]

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE

2.   In searching the devices listed in Attachment A (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data

[Instrumentality Protocol]

iv

falls within the list of items to be seized.

        ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii.    The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

[Instrumentality Protocol]

f.    If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of items to be seized, the government may retain
forensic copies of the digital device but may not access data
falling outside the scope of the items to be seized (after the
time for searching the device has expired) absent further court
order.

g.    The government may retain a digital device itself
until further order of the Court or one year after the
conclusion of the criminal investigation or case (whichever is
latest), only if the device is determined to be an
instrumentality of an offense under investigation or the
government, within 14 days following the time period authorized
by the Court for completing the search, obtains an order from
the Court authorizing retention of the device (or while an
application for such an order is pending).  Otherwise, the
government must return the device.

h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

3.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

[Instrumentality Protocol]

vi

a.    Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

4.    During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of any person, who is located at 215 North Commonwealth, Apartment C, Los Angeles, CA during the execution of the search and who is reasonably believed by law enforcement

[Instrumentality Protocol]

vii

to be a user of a fingerprint sensor-enabled device that is located at the residence and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

5. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

[Instrumentality Protocol]

## AFFIDAVIT

I, Zachary J. Oper, being duly sworn, declare and state as follows:

### VI.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search **215 North Commonwealth Avenue, Apartment C., Los Angeles, CA 90004** (the "RESIDENCE") as described more fully in Attachment A.  The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1159, (Misrepresentation of Indian produced goods and products), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

2.    I previously obtained a search warrant that described the RESIDENCE as on the first floor of the building.  Upon entering, I realized that the RESIDENCE contained a basement and a second floor.  I submit this application to correct the description of the RESIDENCE.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

[Instrumentality Protocol]

## VII. **BACKGROUND FOR SPECIAL AGENT ZACHARY OPER**

4.     I am a Special Agent with the United States Department of Interior, United States Fish and Wildlife Service, Office of Law Enforcement ("USFWS") in Albuquerque, New Mexico.  I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code.

5.     I have worked for the USFWS as a Special Agent ("SA") since January 2017.  Before transferring to USFWS, I worked as the Assistant Special Agent-in-Charge for the Bureau of Land Management ("BLM"), Office of Law Enforcement and Security from October 2010 until January 2017.  From April 2006 until October 2010, I worked as a BLM SA.  Prior to working as an SA, I was a BLM Law Enforcement Ranger for approximately three and a half years and a United States Border Patrol Agent for approximately five years.  I have over twenty years of Federal law enforcement experience.  I have received and completed formal training that included a twelve-week Criminal Investigator training program in Glynco, Georgia.  I have specialized training and experience in the investigation of crimes relating to the theft, fraud, trafficking, and destruction of natural and cultural resources, with a special emphasis on Native American items.  I have investigated violations of the Indian Arts and Crafts Act and have become familiar with the tactics and techniques associated with counterfeiters.  Specifically, I have learned how

[Instrumentality Protocol]

2

fraudulent pieces of jewelry are manufactured and then distributed throughout the United States and sold as authentic Native American jewelry, including the use of digital devices to facilitate the manufacture and distribution of counterfeit goods. I am familiar with the marketing methods used to deceive consumers. I am also familiar with the Native American jewelry market and how it is valued and advertised as made by particular Native American artisans. I have personally been involved in obtaining federal search and arrest warrants, and I have directed, coordinated, and assisted other law enforcement officers in the executions of these warrants, including search warrants for residences and digital devices.

## VIII. SUMMARY OF PROBABLE CAUSE

6. On December 7, 2017, the Honorable Judge Rozella Oliver, United States Magistrate Judge signed a search warrant for the RESIDENCE, 2:17-MJ-3090, which described the RESIDENCE as occupying the first floor of the building. Law enforcement executed the search warrant on December 13, 2017 and learned that the RESIDENCE includes a basement and a second floor.

## IX. STATEMENT OF PROBABLE CAUSE

7. On December 7, 2017, the Honorable Judge Rozella Oliver, United States Magistrate Judge, signed a search warrant for the RESIDENCE, 2:17-MJ-3090, which is attached hereto as Exhibit 1. Exhibit 1 is incorporated herein in its entirety. Attachment A to the search warrant for the RESIDENCE described the RESIDENCE as "Apartment C on the first floor" of the building. At the time I presented the search warrant to Judge

[Instrumentality Protocol]

3

Oliver, I believed that the RESIDENCE occupied only the first floor of the building based on a floor plan I obtained from a 2016 Wells Fargo foreclosure proceeding against the RESIDENCE's building. The floor plan showed two separate floors, each of which appeared to be a separate unit.

8.    On December 13, 2017, USFWS agents executed the search warrant for the RESIDENCE and learned that the Wells Fargo floor plan was not an accurate depiction of the building or the RESIDENCE.    USFWS agents knocked on the door of the RESIDENCE, saw lights turn on and off in the RESIDENCE, and saw HAACK's vehicles in the rear of the RESIDENCE.    No one opened the door to the RESIDENCE, and then USFWS entered the RESIDENCE by breaking open the door.    Upon entering the RESIDENCE, I saw that the RESIDENCE included three levels: a basement, the first floor, and the second floor.    The second floor is accesible from an open stairway from the first floor.    The basement is accessible through an unlocked door in the kitchen on the first floor.[1]

9.    HAACK, along with his girlfriend Zenia Orbe and two of HAACK and Orbe's children, were present in the RESIDENCE.    HAACK and Orbe's children were on the second floor of the RESIDENCE, which USFWS agents entered to conduct a safety search because the second floor and the first floor of the RESIDENCE are connected.

---

[1] A second unit, which is not part of the RESIDENCE and that I am not seeking authority to search, also appears to be on the first floor of the building and is accessed from a different front entry door.    This second unit was also not part of the Wells Fargo floor plan.

[Instrumentality Protocol]

4

10. USFWS began searching the second floor, including digital devices found on the second floor, but stopped the search immediately after realizing that the second floor was not included in the December 7, 2017 search warrant. USFWS did not search the basement. I do not rely on anything from that search of the second floor of the RESIDENCE to form the probable cause basis for this warrant.

## IX. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

11. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices,

[Instrumentality Protocol]

I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

[Instrumentality Protocol]

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

[Instrumentality Protocol]

actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.

[Instrumentality Protocol]

8

In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

[Instrumentality Protocol]

9

Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by

[Instrumentality Protocol]

10

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

12. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor. Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID." Once a user has set up the fingerprint sensor feature in the security

[Instrumentality Protocol]

11

settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

13.   In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device.  For example, with Apple's Touch ID feature, these circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked; and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.  Other brands have similar restrictions.  I do not know the passcodes

[Instrumentality Protocol]

of the devices likely to be found at the RESIDENCE.

14. For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of any user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant. The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at the RESIDENCE, during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the RESIDENCE, and falls within the scope of the warrant. The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search. Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

15. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

[Instrumentality Protocol]

13

## CONCLUSION

16. Based on the foregoing, there is probable cause to believe that the evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found at the RESIDENCE, described in Attachment A.

_____
Zachary J. Oper
Special Agent, USFWS


Subscribed to and sworn before
me this 13th day of December,
2017.


_____
HONORABLE ROZELLA OLIVER
UNITED STATES MAGISTRATE JUDGE

[Instrumentality Protocol]

14

# Exhibit 1

ORIGINAL

AO 93  (Rev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No.   2:17-MJ-3090 |
| The Residence at 215 North Commonwealth Avenue, Apartment C, Los Angeles, CA 90004 | ) |
| | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property. Such affidavit is incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before _____14 days from the date of its issuance_____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.

☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   12-7-17 @ 2:25 pm      ~~*(signature)*~~
Judge's signature

City and state:      Los Angeles, CA      R. A. Oliver   USMJ
*Printed name and title*

AUSA:  Katherine A. Rykken, x. 3659

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| *Return* | | |
|---|---|---|
| Case No.:<br>2:17-MJ-3090 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |

Inventory of the property taken and name of any person(s) seized:
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes).  If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

**Certification**  (by officer present during the execution of the warrant)

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.*

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AUSA: Katherine A. Rykken, x. 3659

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The property to be searched is the home of Robert HAACK and Zenia Orbe, located at 215 North Commonwealth Avenue, Apartment C on the first floor of the duplex in Los Angeles, California, 90004 (the "RESIDENCE"). The RESIDENCE is the first floor unit of a two-unit, two-story property, white in color, approximately 2,103 square feet, and surrounded by a privacy fence. The RESIDENCE has a gate that has to be manually opened to enter or exit the driveway. The rear of the RESIDENCE is paved and used for parking and storage.

i

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.    All evidence at the location described in Attachment A that relates to violations of 18 U.S.C. § 1159, sale of items falsely represented as made by a particular Native American artisan, including:

a.    Loloma style jewelry bearing any variation of the "Loloma" hallmark;

b.    Lists of customers and related identifying information; types, amounts, and prices of jewelry produced sold and or manufactured; any and all correspondence in relation to jewelry sales, production or business practices; all bank records, checks, credit card bills, account information, books, records, receipts, notes, ledgers, and other records as they may relate to the aforementioned violations of the Indian Arts and Crafts Act; the term "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMSs, optical discs, backup tapes, printer buffers, smart cards, flash/thumb drives, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting):

[Instrumentality Protocol]

any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, and photocopies);

      c.   tools and instruments involved in the manufacturing, production and sales of jewelry;

      d.   personal books and records reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture and sale of the prohibited items;

      e.   hallmarking/signature tool(s) with any combination of letters;

      f.   documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, credit card receipts, and telephone bills recording travel;

      g.   documents relating to birth, heritage, or lineage; and

      h.   documents indicating property ownership and tenancy.

[Instrumentality Protocol]

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE

2.   In searching the devices listed in Attachment A (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.   The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.   The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.   The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data

[Instrumentality Protocol]

falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.     The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

[Instrumentality Protocol]

v

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

[Instrumentality Protocol]

a.     Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

b.     Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.     Any magnetic, electronic, or optical storage device capable of storing digital data;

d.     Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.     Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.     Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.     Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

4.     During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of any person, who is located at 215 North Commonwealth, Apartment C, Los Angeles, CA during the execution of the search and who is reasonably believed by law enforcement

[Instrumentality Protocol]

vii

to be a user of a fingerprint sensor-enabled device that is located at the residence and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

     5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

[Instrumentality Protocol]

ORIGINAL

AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The Residence at 215 North Commonwealth Avenue,<br>Apartment C, Los Angeles, CA 90004 | )<br>)<br>)<br>)<br>) |

FILED
CLERK, U.S. DISTRICT COURT

DEC - 7 2017

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Case No.  2:17-MJ-3090

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1159 | Misrepresentation of Indian Produced Goods and Products |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Zachary J. Oper, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  12-7-17

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Katherine A. Rykken, x. 3659

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The property to be searched is the home of Robert HAACK and Zenia Orbe, located at 215 North Commonwealth Avenue, Apartment C on the first floor of the duplex in Los Angeles, California, 90004 (the "RESIDENCE"). The RESIDENCE is the first floor unit of a two-unit, two-story property, white in color, approximately 2,103 square feet, and surrounded by a privacy fence. The RESIDENCE has a gate that has to be manually opened to enter or exit the driveway. The rear of the RESIDENCE is paved and used for parking and storage.

i

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   All evidence at the location described in Attachment A
that relates to violations of 18 U.S.C. § 1159, sale of items
falsely represented as made by a particular Native American
artisan, including:

a.   Loloma style jewelry bearing any variation of the
"Loloma" hallmark;

b.   Lists of customers and related identifying
information; types, amounts, and prices of jewelry produced sold
and or manufactured; any and all correspondence in relation to
jewelry sales, production or business practices; all bank
records, checks, credit card bills, account information, books,
records, receipts, notes, ledgers, and other records as they may
relate to the aforementioned violations of the Indian Arts and
Crafts Act; the term "records" and "information" include all of
the foregoing items of evidence in whatever form and by whatever
means they may have been created or stored, including any
electrical, electronic or magnetic form (such as any information
on an electronic or magnetic storage device, including floppy
diskettes, hard disks, ZIP disks, CD-ROMSs, optical discs,
backup tapes, printer buffers, smart cards, flash/thumb drives,
as well as printouts or readouts from any magnetic storage
device); any handmade form (such as writing, drawing, painting):

[Instrumentality Protocol]

ii

any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, and photocopies);

        c.    tools and instruments involved in the manufacturing, production and sales of jewelry;

        d.    personal books and records reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture and sale of the prohibited items;

        e.    hallmarking/signature tool(s) with any combination of letters;

        f.    documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, credit card receipts, and telephone bills recording travel;

        g.    documents relating to birth, heritage, or lineage; and

        h.    documents indicating property ownership and tenancy.

[Instrumentality Protocol]

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICE

2.    In searching the devices listed in Attachment A (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data

[Instrumentality Protocol]

iv

falls within the list of items to be seized.

   ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

   e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

**[Instrumentality Protocol]**

v

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

[Instrumentality Protocol]

vi

a.    Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

4.    During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of any person, who is located at 215 North Commonwealth, Apartment C, Los Angeles, CA during the execution of the search and who is reasonably believed by law enforcement

[Instrumentality Protocol]

vii

to be a user of a fingerprint sensor-enabled device that is located at the residence and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

[Instrumentality Protocol]

## AFFIDAVIT

I, Zachary J. Oper, being duly sworn, declare and state as follows:

### VI. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of an application for a warrant to search **215 North Commonwealth Avenue, Apartment C., Los Angeles, CA 90004** (the "RESIDENCE") as described more fully in Attachment A. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1159, (Misrepresentation of Indian produced goods and products), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### VII. BACKGROUND FOR SPECIAL AGENT ZACHARY OPER

3. I am a Special Agent with the United States Department of Interior, United States Fish and Wildlife Service, Office of Law Enforcement ("USFWS") in Albuquerque, New Mexico. I am an "investigative or law enforcement officer" of the United States

within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code.

4. I have worked for the USFWS as a Special Agent ("SA") since January 2017. Before transferring to USFWS, I worked as the Assistant Special Agent-in-Charge for the Bureau of Land Management ("BLM"), Office of Law Enforcement and Security from October 2010 until January 2017. From April 2006 until October 2010, I worked as a BLM SA. Prior to working as an SA, I was a BLM Law Enforcement Ranger for approximately three and a half years and a United States Border Patrol Agent for approximately five years. I have over twenty years of Federal law enforcement experience. I have received and completed formal training that included a twelve-week Criminal Investigator training program in Glynco, Georgia. I have specialized training and experience in the investigation of crimes relating to the theft, fraud, trafficking, and destruction of natural and cultural resources, with a special emphasis on Native American items. I have investigated violations of the Indian Arts and Crafts Act and have become familiar with the tactics and techniques associated with counterfeiters. Specifically, I have learned how fraudulent pieces of jewelry are manufactured and then distributed throughout the United States and sold as authentic Native American jewelry, including the use of digital devices to facilitate the manufacture and distribution of counterfeit goods. I am familiar with the marketing methods used to deceive

[Instrumentality Protocol]

2

consumers.  I am also familiar with the Native American jewelry market and how it is valued and advertised as made by particular Native American artisans.  I have personally been involved in obtaining federal search and arrest warrants, and I have directed, coordinated, and assisted other law enforcement officers in the executions of these warrants, including search warrants for residences and digital devices.

## VIII.    SUMMARY OF PROBABLE CAUSE

8.    Robert HAACK sold counterfeit Charles Loloma jewelry as eBay seller "harvardantique" from 2013 to 2015 from the RESIDENCE.  HAACK continued to sell counterfeit Loloma jewelry directly to customers from 2015 to 2017, likely from the RESIDENCE.  In 2017, HAACK purchased raw materials that I know, based on my training and experience, are used to make counterfeit Loloma jewelry.  Also in 2017, D.H. told me that HAACK sold him/her Loloma jewelry, likely from the RESIDENCE, that I believe to be counterfeit.  HAACK continues to live at the RESIDENCE.

## IX.    STATEMENT OF PROBABLE CAUSE

### A.    The Indian Arts and Crafts Act Criminalizes the Sale of Items Falsely Sold as Native American Arts and Crafts

5.    In response to growing sales of counterfeit Native American arts and crafts, Congress passed the Indian Arts and Crafts Act of 1990, P.L. 101-644.  The Indian Arts and Crafts Act is a truth-in-advertising law that prevents products falsely marketed as "Indian" or "Native American" when the products are not, in fact, made by Native Americans.  Subsequently, the

[Instrumentality Protocol]

3

Indian Arts and Crafts Amendments Act of 2010, P.L. 111-211, allowed the Indian Arts and Crafts Board to refer cases to any federal law enforcement officer for investigation. In 2012, the Indian Arts and Crafts Board entered into an agreement with the USFWS to develop an investigative unit to pursue violations of the Indian Arts and Crafts Act.

**B. Background on Counterfeit Charles Loloma Jewelry**

9. In 2012, the USFWS began investigating Indian Arts and Crafts Board complaints about sales of counterfeit Charles Loloma jewelry. Loloma (who was born in 1921 and died in 1991) is one of the most significant Native American artists of the twentieth century. He is widely recognized as the father of contemporary American Indian jewelry because his innovative style was a complete departure from traditional forms. Loloma was a member of the Hopi Tribe and became famous for his work. As a result, his work is highly collectible. Loloma's pieces regularly sell for thousands of dollars. Counterfeit Loloma pieces began appearing on the market as early as 2008.

10. Verma Nequatewa and Robert Rhodes are Loloma jewelry experts that the USFWS used during this investigation. Nequatewa is Loloma's niece and worked with him from the 1960's until his death in 1991. Loloma did most of the single-stone settings and metalwork, while Nequatewa made most of the inlay jewelry. Rhodes, who is married to Nequatewa, was Loloma's business manager. Rhodes handled the invoices, payments, and deposits for Loloma's jewelry sales.

[Instrumentality Protocol]

4

## C. Purchases of Counterfeit Loloma Pieces from HAACK

Undercover Purchase of Counterfeit Loloma Ring

11. On or about April 4, 2013, eBay seller "harvardantique" offered for sale a ring (item #151020989408) through ebay.com. Seller "harvardantique" described the ring as follows:

> "One Owner Charles Loloma Kachina Face Ring. A Rare Charles Loloma Kachina Face Ring in Silver and Gold Charles Loloma (Hopi, 1921 - 1992. A superb Charles Loloma Kachina Face ring. The Kachina Faces are the most coveted and desirable of all of Charles Loloma's work. This one, set with exquisite gemstones and gold bars in sterling silver, is in pristine, original condition with no discernable flaws to the stones or the metal. Charles Loloma Kachina face themed rings are extremely rare and this example may be unique within Loloma's body of work. For the lucky few of you that have a face bracelet or pendant, this piece represents a particularly rare opportunity to pair it up. Acquired from Charles Loloma at Hotevilla in 1984. Signed Charles Loloma."

12. A USFWS SA, operating in an undercover capacity, placed a winning bid of $4,300.00 for the item on April 7, 2013. The undercover USFWS SA communicated with "harvardantique" via email about shipping options. In email communications with the undercover USFWS SA, "harvardantique" stated that the ring "was purchased by my mother and father on one of their many trips through Hopi in that began in the late 60's and continued until the early 90's. My father was the founder of International Metals Corporation (NYSE:IMCO) and traveled by car several times each year between his facilities in Tulsa, OK and Ventura, CA.

[Instrumentality Protocol]

5

It was on these trips that my family acquired the Native American collection of which Loloma is a part.  Best regards, Robert."  Robert is HAACK'S first name.

13.  On April 9, 2013, the undercover SA completed the purchase of the ring by paying seller "harvardantique" $4,300.00 through PayPal. The undercover SA received a receipt from PayPal which listed the business name as "John Michael" and an email address of txqfkj@yahoo.com.  On April 19, 2013, the undercover SA received the counterfeit Loloma ring in the mail.[1]

14.  On May 24, 2017, A USFWS SA received DMV records for HAACK's father, Clarence Walter Haack.  Clarence Walter Haack's Driver's License pictures included two photos of Clarence Haack from June 18, 1991 and May 10, 1995.  A USFWS agent sent these photos to Nequatewa and Rhodes but neither recognized Clarence Haack.  Rhodes responded via email as follows: "I was business manager for Charles Loloma from 1978 through 1980.  As such I handled invoices, payments and deposits.  I do not recognize Clarence Haack from the images, nor do I remember the name from

---

[1] My review of eBay records shows that on January 27, 2013 and July 7, 2013, eBay seller "harvardantique" advertised on eBay two pieces of Loloma jewelry containing Brazilian Rosewood. Nequatewa told USFWS SAs that Loloma did not use Brazilian Rosewood.  On July 22, 2012 and August 25, 2013, eBay seller "harvardantique" advertised two additional Loloma pieces of jewelry that appear to contain Brazilian Rosewood, based on the images on eBay.

[Instrumentality Protocol]

6

invoices or checks.  Verma [Nequatewa] worked at the Loloma
studio with Charles [Loloma], assisting with production and
sales, from before 1970 to the time the studio was closed in
1989.  She does not recognize Clarence Haack from the images and
does not remember the name.  It would be most unusual for an
individual to purchase more than 2-3 pieces at any time.  There
were a few gallery owners who might purchase several pieces,
usually a variety including large and smaller pieces during one
visit.  At the Loloma Studio, repeat customers were remembered,
and any who bought more than one or two pieces at once would
surely have been remembered.  Even during the 1970's and 1980's,
Loloma pieces were considered expensive.  Anyone who would have
bought several pieces, and several pieces on repeated trips,
would have been remembered as a very special customer.  There
are only a very few collectors who would have such a large
collection of Loloma pieces, none of whom would have purchased
39 or more pieces directly from the studio.  Those collectors
would have purchased pieces at various gallery shows throughout
the country and perhaps a few pieces directly from the studio."

<u>Undercover Purchase of Counterfeit Loloma Bracelet</u>

15.  On June 15, 2014, eBay seller "harvardantique" offered
for sale one bracelet (item #151323282204) through ebay.com.
Seller "harvardantique" described the bracelet as follows:

"One  Owner  Charles  Loloma  Modernist  Katsina  Face

[Instrumentality Protocol]

7

Bracelet. Charles Loloma, 1921 - 1991, Hopi. A superb
Charles Loloma Katsina Face bracelet. The Kachina Faces
are the most coveted and desirable of all of Charles
Loloma's work. This one, with 88 exquisite gemstones
and 18 karat gold set in sterling silver, is in pristine,
original condition with no discernable flaws to the
stones or the metal. Charles Loloma Katsina face
bracelets come on the market very infrequently and it
will take many trips to Santa Fe, a great deal of
patience, and a large pocketbook to come up with another
of this caliber. This one owner masterpiece was created
at the height of Loloma's career and is representative
of his very finest work. Acquired from Charles Loloma
in 1981. Signed Charles Loloma."

16. A USFWS undercover SA placed a winning bid of

$15,098.00 for the item on July 15, 2014. The undercover SA

then paid seller "harvardantique" $15,098.00 for the bracelet

using PayPal. EBay records again listed the seller as "John

Michael" with user name "harvardantique," using the email

address tkqfkj@yahoo.com. On July 18, 2014, the agent received

the bracelet in the mail. A note in the box with the bracelet

stated: "Fr: Robert Haack, 215 North Commonwealth Avenue, Los

Angeles, California 90004." The address in the note is the

address of the RESIDENCE.

### D. HAACK Identified as Seller "harvardantique"

17. A USFWS SA subpoenaed eBay and PayPal for the records

of "harvardantique." Records from eBay for the seller

"harvardantique" list the RESIDENCE as the business address and

the email txqfkj@yahoo.com as the business contact email. The

eBay account for "harvardantique" is registered to "John

[Instrumentality Protocol]

8

Michael." A Law Enforcement database search showed that HAACK's brother is named John Michael Haack. This investigation has not yielded any evidence that John Michael Haack is actually involved in the counterfeit business or lives at the RESIDENCE. Zenia Orbe, as discussed below, lives with HAACK at the RESIDENCE. Orbe is also listed on the eBay and PayPal accounts.

18. Ebay records, previously identified purchases, and HAACK's banking records revealed from December 2008 until March 2015 eBay seller "harvardantique" was associated with HAACK. During that time, HAACK sold approximately 41 pieces of purported Loloma jewelry on eBay for an estimated amount of $439,810.95. In many sales, HAACK stated that the Loloma jewelry had had only one owner. Based on the information received from Rhodes, described above, I believe that all of the pieces HAACK sold were counterfeit Loloma jewelry.

19. Based on my training and experience and information from the investigation, I believe that HAACK is the person associated with eBay account "harvardantique."

## E. Forensic Examination of the Counterfeit Ring and Bracelet

20. On January 13, 2015, USFWS SAs, Nequatewa, and Rhodes traveled to the National Fish and Wildlife Forensic Laboratory in Ashland, Oregon to forensically examine the ring and bracelet that the USFWS had purchased in the undercover purchases on

[Instrumentality Protocol]

April 7, 2013 and July 15, 2014. Nequatewa and Rhodes brought along several pieces of genuine Loloma jewelry for comparison. USFWS Deputy Director Ed Espinoza and Forensic Scientist Pam McClure examined the ring and bracelet purchased during the undercover purchases.

21. Espinoza compared Loloma's stamped signature on the counterfeit ring and bracelet against the genuine Loloma stamped signature. Espinoza determined that signature stamp on the counterfeit ring and bracelet were inconsistent with the genuine Loloma signature stamp based on variances in spacing, depth and the outline of the signature stamp. Based on his experience and training and knowledge of the investigation, Espinoza concluded that the tool used to stamp Loloma's signature on the counterfeit ring and bracelet was not an authentic Loloma signature stamp.

22. At the request of the USFWS, Nequatewa disassembled the counterfeit bracelet for analysis. She disassembled the item by exposing it to heat which liquefied the epoxy used to build the bracelet. Nequatewa reported to the USFWS that she learned the following:

a. The ivory and turquoise inlay pieces and silver spacers did not go all the way to the base of the bracelet. They were floating in a bed of epoxy and ended just below the outside bezel. If genuine, there would be less epoxy and both

[Instrumentality Protocol]

the ivory and turquoise inlay and the silver spacers would extend to the base of the bracelet.

b.     The shape of the counterfeit bracelet is round, whereas genuine Loloma bracelets are oval shaped.

c.     The counterfeit bracelet's opening did not taper down towards the ends as it would have on a genuine Loloma bracelet.

d.     The base of the bracelet had etching and hammer marks.  A genuine Loloma piece could possibly have scratch marks from a needle file or dental tool but not any etching or hammer marks.

e.     The opening of the counterfeit bracelet did have an opening toward the inlaid part of the bracelet as it would have in a genuine Loloma bracelet.

f.     The order of construction of the counterfeit bracelet's ends did not match the order of construction on a genuine Loloma bracelet.

g.     The counterfeit bracelet had silver inserts between each ivory piece of inlay and too many gold accents in the turquoise inlay, neither of which is consistent with a genuine Loloma piece.  The amount of silver and gold consequently makes the counterfeit bracelet heavier than a genuine Loloma bracelet.

h.     Finally, the entire inlay of the counterfeit

[Instrumentality Protocol]

11

bracelet is the same height, whereas a genuine Loloma bracelet's inlay would have been tapered in width and height, from the middle of the bracelet toward the ends.

### F.  L.C. and D.H's Purchases from HAACK

L.C.'s Purchases of Counterfeit Loloma Jewelry from HAACK

23.  A review of the subpoenaed records for the "harvardantique" eBay and PayPal account show that customer L.C. purchased a counterfeit Loloma piece on April 6, 2015 from "harvardantique." On April 14, 2015, L.C. received a refund from "harvardantique." On May 16, 2017, a USFWS SA contacted L.C. about the purchase. L.C. explained that the piece of jewelry arrived amazingly packed and appeared pristine and new. L.C. asked "harvardantique" about the piece but "harvardantique" could not answer specific questions and stated only that piece was purchased for his mother. L.C. then contacted Nequatewa and Rhodes and thereafter decided to ask "harvardantique" for a refund. L.C. had previously purchased another Loloma piece from "harvardantique," which L.C. hopes "is legitimate." Following L.C.'s request for a refund, "harvardantique" stopped selling Loloma pieces on eBay.

24.  My review of eBay records shows that on January 27, 2013 and July 7, 2013, eBay seller "harvardantique" advertised on eBay pieces of Loloma jewelry containing Brazilian Rosewood. Nequatewa told USFWS SAs that Loloma did not use Brazilian

[Instrumentality Protocol]

12

Rosewood.  On July 22, 2012 and August 25, 2013, eBay seller
"harvardantique" advertised two additional Loloma pieces of
jewelry that appear to contain Brazilian Rosewood, based on the
images on eBay.

### D.H.'s Purchases of Counterfeit Loloma Jewelry from HAACK

25.  In addition to the eBay and PayPal records, a USFWS SA
subpoenaed records for HAACK's Bank of America account in early
2017.  These records show that from approximately 2009 through
early 2015, an eBay customer named D.H. purchased 21 pieces of
purported Loloma jewelry from "harvardantique" for approximately
$154,772.97, paid from D.H.'s checking account.  HAACK's Bank of
America records show that the checks from D.H. were deposited
during 2010 through 2015[2] in amounts equal to the purchase
price(s) of purported Loloma jewelry that D.H. purchased from
"harvardantique" on eBay.  Each check is written directly to
HAACK from D.H and sometimes pays for more than one item.  Bank
of America records show that D.H. also wrote an additional nine
checks directly to HAACK for a total amount of $60,694.00 from
May 2015 through February 2017.  These check amounts are
reflected in the below table.

26.  On November 2, 2017, I spoke with D.H.  D.H. estimated
that s/he had purchased approximatelt 20 pieces of purported
Loloma jewelry from HAACK.  Beginning in 2015, HAACK contacted

---

[2] Bank of America did not have 2009 records.

[Instrumentality Protocol]

13

her directly sell jewelry to her directly rather than using eBay. For example, D.H. said that HAACK contacted him/her in late 2016 or early 2017 and offered to sell a Loloma piece of jewelry. D.H. agreed to purchase the item and wrote three checks to pay for the piece of jewelry in full. D.H. said that HAACK shipped the piece of Loloma jewelry to her, but s/he did not remember the shipping service. D.H. agreed that the address of the RESIDENCE sounded like the address from which the package came from HAACK. D.H. did not permit me to examine the items she purchased from HAACK and said that she believes they are genuine. Again, based on this investigation to date, I believe HAACK did not sell authentic Loloma jewelry.

## G. HAACK's Recent Purchases of Raw Materials and Equipment

27. USFWS SAs identified financial institutions related to HAACK and Orbe through subpoenas. Based on my review of bank records related to HAACK and Orbe's accounts, I learned the following information:

a. Based on my training and experience and knowledge of the investigation, I know that the Tucson Gem, Mineral and Fossil Showcase ("Tucson Gem Show") is held each year in late January through early February in multiple locations in Tucson, Arizona. The Tucson Gem Show offers for sale minerals, cut stones, and raw materials for making jewelry. Shoppers travel from all over the world to visit the Tucson Gem Show to shop for jewelry and jewelry making supplies. Based on my training and

[Instrumentality Protocol]

experience and knowledge of the investigation, I know that jewelry makers, such as HAACK, buy supplies that will last for years, rather than just making purchases for short-term projects.

b.    I learned that HAACK's debit cards were used during six different years in Tucson, including 2017, during the Tucson Gem Show.

c.    In 2017, the Tucson Gem Show was located at the SMG-Tucson Convention Center from February 9, 2017, to February 12, 2017.  Financial records show that HAACK's Bank of America debit card was used to purchase lodging at the Hotel Tucson City Center in Tucson, Arizona, for $620.05 on February 12, 2017. Financial records show that Orbe's Chase credit card was used to make purchases at various jewelry and supply stores in Tucson from February 8, 2017, to February 12, 2017.  Based on my training and experience and knowledge of this investigation, the stores from which Orbe purchased items sell products consistent with making counterfeit Loloma jewelry.  Financial records did not reveal any purchases at the Tucson Gem Show.

d.    In addition to purchases from 2017, HAACK also purchased items in other years.  For example, HAACK's Bank of America debit card made a purchase for $386.00 at the Red Shell Jewelry Store ("Red Shell") in Gallup, New Mexico on approximately April 5, 2007.  On August 9, 2017, USFWS SAs contacted John and Sylvia Hornbek at Red Shell in Gallup, New Mexico.  The Hornbeks are the owners of Red Shell.  The Hornbeks were unable to find the invoice related to HAACK's April 5, 2007

[Instrumentality Protocol]

15

purchase but stated that the amount was consistent with a sale of spiny oyster shells that he sells as raw material. Based on my training and experience and knowledge of this investigation, spiny oyster shells are a product used for making counterfeit Loloma jewelry.

      e.    From July 1, 2008 to December 1, 2008, HAACK's Bank of America debit card was used to make eight purchases at A&A Jewelry Supply. On July 5, 2017, A&A Jewelry Supply provided USFWS SAs with seven invoices related to seven of the eight purchases. The invoices showed that HAACK purchased materials and tools to make jewelry. Nequatewa and Rhodes told me that the purchased items "could be used to make Loloma looking pieces" and that although a "120 degree diamond flywheel is not something Charles [Loloma] or Verma [Nequatewa] used, [it] could be used for Loloma copies."

      f.    In 2011, the Tucson Gem Show was located at the SMG-Tucson Convention Center from February 4, 2011, to February 6, 2011. Financial records show that $2,000.00 was withdrawn from HAACK's Bank of America checking account in Los Angeles, California on February 3, 2011. Based on my training and experience and knowledge of this investigation, I know that gem buyers can purchase raw materials for making jewelry by paying cash or by using a credit card. By paying cash for raw materials, individuals can avoid financial transaction records. From February 4, 2011, to February 6, 2011, HAACK's Bank of America debit card was used to make seven purchases at the Tucson Gem Show. Based on my training and experience and

[Instrumentality Protocol]

knowledge of this investigation, the Tuscon Gem Show sellers have products consistent with making counterfeit Loloma jewelry.

g. On July 13, 2011 and on September 24, 2014, HAACK purchased blades and a blade brush from Covington Engineering Corporation. The blades that HAACK purchased are designed for lapidary and glass work. Covington advertises that these blades are designed for cutting hard materials such as agate, geodes, and petrified wood. Based on my training and experience and knowledge of the investigation, I know that blades and a blade brush can be used multiple times. These items are durable and can last for years.

h. Finally, HAACK's Bank of America debit card was used to make a purchase at the Tucson Gem Show on February 14, 2014 from Ivory Jacks Trading Co., located in Bothell, Washington, for $187.00. Based on my training and experience and knowledge of this investigation, Ivory Jacks Trading sells products consistent with making counterfeit Loloma jewelry. HAACK's debit card was also used to pay for lodging at the Holiday Inn in Tucson, Arizona.

**H. Identification of the RESIDENCE**

28. On September 26, 2017, a USFWS SA saw HAACK unlocking the gate at the RESIDENCE. On September 27, 2017, a USFWS SA saw Orbe, identified by comparing her to her driver's license photograph, leaving the RESIDENCE driving a 1997 Mercedes sedan with a California license plate of 5LAL157. A check of DMV records shows that the Mercedes is registered to HAACK. The

[Instrumentality Protocol]

17

RESIDENCE is the lower floor of a two-story duplex.

29.   On September 27, 2017, a USFWS SA saw HAACK driving a 2001 Volkswagen van with California license plate 7XAU299 away from the RESIDENCE.   A check of DMV records shows that the Volkswagen is registered to HAACK.   The USFWS SA followed HAACK on September 27, 2017 and saw HAACK stop at the United States Post Office and mail a six to twelve inch corrugated box.   The box is similar is size and shape to the box in which the USFWS received the counterfeit ring and bracelet.   On September 27, 2017, the USFWS SA saw both the Mercedes and Volkswagen parked behind the RESIDENCE.

30.   I reviewed financial and property records for the RESIDENCE, which showed that HAACK is the owner of the RESIDENCE.   The RESIDENCE is currently mortgaged with Wells Fargo Bank in HAACK's name.

## X.   TRAINING AND EXPERIENCE REGARDING INDIAN ARTS AND CRAFTS ACT OFFENSES

37.   Based upon my training and experience, as well as the corporate knowledge and experience of other agents and law enforcement officers in my office, I know the following:

a.   Native American jewelry counterfeiters store their inventory and related materials in their residences. Depending on the amount of jewelry production, raw materials and jewelry making equipment purchased years prior are more likely

[Instrumentality Protocol]

18

than not to still be in the counterfeiter's possession.  It is common for counterfeiters to buy raw materials in bulk and retain them in their residences for future reproduction.  This includes, but is not limited to:

i.    The prohibited items themselves including jewelry making equipment/supplies/tools, gems, raw material minerals to include turquoise, silver, and gold, grinders, polishers, epoxy, signature stamps/punches, hallmarking tools, wax molds, etc.;

ii.    items related to the packaging, processing, storage, shipping and transportation of the prohibited items;

iii.    books, records, receipts, notes, ledgers, correspondence and other records relating to the distribution of the prohibited items;

iv.    personal notes/ledgers and records reflecting names, addresses, telephone numbers and other contact or identification data relating to the distribution of the prohibited items;

v.    records relating to income and expenditures of money related to the sale and transfer of prohibited items, for example, money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers; and

[Instrumentality Protocol]

vi.     documents indicating travel in interstate and foreign commerce such as travel itineraries, motel and hotel receipts, credit card receipts, and telephone bills.

b.     Further, it is generally a common practice for counterfeiters to maintain in their residences records relating to their fraudulent activities.  Because counterfeit items derive value from purported authenticity, in many instances counterfeiters will maintain records to duplicate authenticity. It is common practice for a counterfeiter to keep transactional records to show sale and transfer of items.  Additionally, counterfeiters must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their business.

c.     It is also a generally common practice for counterfeiters to maintain records of wire transfers, cashier checks, and money orders related to the sale and transfer of prohibited items.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with the sales of the fraudulent items would also typically be maintained in residences.

d.     I know that handmade Native American jewelry is manufactured by use of various techniques, to include cutting, buffing, grinding, polishing and stone placement with the use of turquoise, silver, coral and lapis.  Other equipment—such as

[Instrumentality Protocol]

20

hallmarking tools, grinders, buffing instruments, chemicals, solvents and adhesives, and the like—is typically used in this production process. Once the jewelry has been produced, a usual practice is to package the jewelry in individual sealed cellophane or plastics bags, and then place those bagged items in sequentially larger bags or boxes for transportation.

## XI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices,

[Instrumentality Protocol]

I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

   a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

   b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

[Instrumentality Protocol]

22

c.     The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[3] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not

---

[3] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

[Instrumentality Protocol]

actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

　　　　e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.

[Instrumentality Protocol]

In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

[Instrumentality Protocol]

25

Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

   g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

39.  As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor. Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID."  Once a user has set up the fingerprint sensor feature in the security

[Instrumentality Protocol]

27

settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

40. In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device. For example, with Apple's Touch ID feature, these circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked; and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made. Other brands have similar restrictions. I do not know the passcodes

[Instrumentality Protocol]

28

of the devices likely to be found at the RESIDENCE.

41.  For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of any user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant.  The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at the RESIDENCE, during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the RESIDENCE, and falls within the scope of the warrant.  The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search.  Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

42.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

[Instrumentality Protocol]

## CONCLUSION

43.  Based on the foregoing, there is probable cause to believe that the evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found at the RESIDENCE, described in Attachment A.

_____
Zachary J. Oper
Special Agent, USFWS


Subscribed to and sworn before
me this 7th day of December,
2017.

_____
HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE


[Instrumentality Protocol]